[No. A076423. First Dist., Div. Three. Sept. 29, 1998.]

KIM MARIE THORBURN et al., Plaintiffs and Appellants, v.
DEPARTMENT OF CORRECTIONS et al., Defendants and Respondents.

**COUNSEL**

Stephen D. Schear and Amy M. DelPo for Plaintiffs and Appellants.

George J. Annas as Amicus Curiae on behalf of Plaintiffs and Appellants.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Peter J. Siggins, Assistant Attorney General, Morris Lenk and Robert R. Granucci, Deputy Attorneys General, for Defendants and Respondents.

**OPINION**

**PHELAN, P. J.**—Appellants are 13 physicians licensed in California: Drs. Kim Marie Thorburn, Helen Rodriguez-Trias, Janice Kirsh, Corey Weinstein, Vishwanath Rao Lingappa, Joellen Brainin-Rodriguez, Thomas Woods Crane, Gary Randall Fujimoto, Vincent Iacopino, Anthony B. Iton, Robert Jay Harrison, John Whitson Roark, Jr., and Rajiv Bhatia (collectively, hereinafter, appellants). Respondents are all involved in the execution of judgments of death in California: the California Department of Corrections and its director, which govern and control San Quentin State Prison (hereinafter, San Quentin), where the executions are carried out; Arthur Calderon, warden of San Quentin, who is directly responsible for determining the duties performed by physicians during executions; E. Juel, chief medical

officer at San Quentin, who is required by execution procedures to attend executions; and Q.E. Crews, R.G. Tang, and John Does 1-20, physicians on the San Quentin medical staff who have participated in executions of California inmates (collectively, hereinafter, respondents).

In their complaint, appellants alleged that physician participation in executions constitutes "unprofessional conduct" within the meaning of Business and Professions Code section 2234[1] and that, pursuant to section 2311, they are entitled to an injunction against such conduct in the future. We conclude that the trial court did not err in sustaining respondents' demurrer to the complaint, or in denying appellants' request for leave to amend. Accordingly, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Historically, physicians have participated in lethal gas and lethal injection executions in California. Lethal injection was authorized and became the preferred method of execution in this state in 1996.[2] (See Pen. Code, § 3604, subd. (b); Stats. 1996, ch. 84, § 1.)

On April 18, 1996, appellants filed a civil complaint in San Francisco Superior Court, seeking to enjoin physician participation in future California executions. Appellants alleged that physicians perform the following duties during lethal injection executions: examining the condemned inmate to determine whether any medical condition might interfere with the process; examining the inmate's medical records to determine and prescribe an appropriate sedative; identifying primary and secondary injection sites; making a list and supervising the arrangement of medical supplies needed for execution; preparing syringes with the lethal solution; supervising the attachment of a heart monitor to the inmate and verifying that the inmate's heartbeat can be detected on the instrument; locating appropriate veins for insertion of catheters that will carry the lethal solution; inserting the catheters; monitoring the flow of the lethal substances to ensure that there will be no interruption and death will occur; monitoring the inmate to notify the warden when death has occurred; and pronouncing death.

---

[1] All statutory references are to the Business and Professions Code unless otherwise indicated.

[2] In 1994, the United States District Court for the Northern District of California found that execution by lethal gas constitutes cruel and unusual punishment in violation of the Eighth Amendment, but that ruling was overturned by the United States Supreme Court. (*Fierro v. Gomez* (N.D.Cal. 1994) 865 F.Supp. 1387, affd. *Fierro v. Gomez* (9th Cir. 1996) 77 F.3d 301, 309, cert. granted, vacated, 519 U.S. 918 [117 S.Ct. 285, 136 L.Ed.2d 204].) On remand, the Ninth Circuit ordered the district court to vacate its judgment, subject to reinstatement on the motion of a death row inmate who has standing and presents a ripe claim. (*Fierro v. Terhune* (9th Cir. 1998) 147 F.3d 1158.)

Appellants further alleged that physician participation in an execution is considered unprofessional and unethical conduct by the American Medical Association, the California Medical Association, the World Medical Association, the American College of Physicians, and the American Public Health Association, as well as leading medical ethicists.[3] In addition, appellants claimed that physician participation in executions is fundamentally inconsistent with the healing role of the medical profession and poses a direct threat to the relationship of trust between physicians and patients. Appellants prayed for an injunction prohibiting respondents, their agents, successors, and employees "from requiring the participation of physicians or participating as physicians in any execution conducted by the State of California."

On June 7, 1996, respondents filed a demurrer and notice of hearing on demurrer on the grounds that: (1) appellants' complaint did not allege facts sufficient to state a cause of action; (2) appellants failed to exhaust their administrative remedies;[4] and (3) Code of Civil Procedure section 526, subdivision (b)(4), and Civil Code section 3423, subdivision (d), prohibit the injunctive relief sought by appellants. On July 16, 1996, the trial court sustained the demurrer, and denied appellants leave to amend their complaint due to failure to state facts sufficient to constitute a cause of action pursuant to Code of Civil Procedure section 430.10, subdivision (e). Notice of the court's ruling and proof of service was filed on July 19, 1996.

Appellants filed a motion to reconsider the trial court's ruling, along with a request for leave to file an amended complaint. Appellants included a proposed amended complaint in which they claimed that participation of physicians in executions by lethal injection is not necessary for California to carry out such executions. On September 16, 1996, the trial court denied appellants' motion for reconsideration and request for leave to amend. Judgment in favor of respondents was entered accordingly, and this timely appeal followed.

## II. DISCUSSION

In reviewing a judgment of dismissal entered upon the sustaining of a demurrer, we accept as true all the material facts properly pleaded and we

---

[3]Apparently, the American Medical Association has expressly reserved decision on whether a physician may evaluate an inmate's competence to be executed (Pen. Code, § 3700.5), or treat an incompetent inmate to restore his or her competence to be executed. (American Medical Association, Council on Ethical and Judicial Affairs, Council Rep., *Physician Participation in Capital Punishment* (1993) 270 JAMA 365, 367 (AMA Council Report).)

[4]Respondents have expressly abandoned any claim of error with respect to the trial court's ruling that appellants were not required to exhaust their administrative remedies in this case.

do not go beyond the four corners of the complaint, except as to matters which may be judicially noticed. (*Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58]; *Saunders* v. *Superior Court* (1994) 27 Cal.App.4th 832, 837-838 [33 Cal.Rptr.2d 438]; see also *Winding Creek* v. *McGlashan* (1996) 44 Cal.App.4th 933, 939 [52 Cal.Rptr.2d 236].) We give the complaint a reasonable interpretation, reading it as a whole and construing the alleged facts liberally, to determine whether the alleged facts state a cause of action. (*Blank* v. *Kirwan, supra,* 39 Cal.3d at p. 318; *Edwards* v. *Centrex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 25 [61 Cal.Rptr.2d 518].)

■ Appellants' theory of relief is that physician participation in executions is unethical and is, therefore, "unprofessional conduct" within the meaning of section 2234, and may be enjoined pursuant to section 2311. In relevant part, section 2311 provides: "Whenever any person has engaged or is about to engage in any acts or practices which constitute or will constitute an offense against this chapter, the superior court of any county, on application . . . of 10 or more persons licensed as physicians and surgeons or as podiatrists in this state may issue an injunction or other appropriate order restraining such conduct." Section 2234 defines "unprofessional conduct" as follows: "In addition to other provisions of this article, unprofessional conduct includes, but is not limited to, the following: [¶] (a) Violating or attempting to violate, directly or indirectly, or assisting in or abetting the violation of, or conspiring to violate, any provision of this chapter. [¶] (b) Gross negligence. [¶] (c) Repeated negligent acts. [¶] (d) Incompetence. [¶] (e) The commission of any act involving dishonesty or corruption which is substantially related to the qualifications, functions, or duties of a physician and surgeon. [¶] (f) Any action or conduct which would have warranted the denial of a certificate."

Appellants further assert that the trial court wrongly denied them an opportunity to present proof regarding the precise ethical violations involved in executions, the impact of those violations on the medical profession and on the public, and the possibility of performing state-ordered executions without physician participation. Appellants do not ask us to issue an injunction against physician participation in executions in the first instance. Rather, they ask us to remand the case for trial to resolve the conflict between medical ethics and the warden's rules and regulations after consideration of all the evidence presented. We decline to do so because we agree with respondents that, as a matter of law, and regardless of any evidence appellants may wish to present, physician participation in executions is not "unprofessional conduct" within the meaning of section 2234.

Appellants do not suggest that physician participation in executions is expressly defined as "unprofessional conduct" under section 2234. Rather,

they contend it falls within the general, catch-all language that "unprofessional conduct . . . is not limited to" those types of conduct listed in subdivisions (a) through (g) of section 2234. That is, appellants contend that physician participation in executions "breaches the rules or ethical code of a profession," and that any such ethical violation qualifies as "unprofessional conduct" under section 2234. In support of this argument, appellants cite *Shea* v. *Board of Medical Examiners* (1978) 81 Cal.App.3d 564 [146 Cal.Rptr. 653] (*Shea*), and *Wilson* v. *Houston Funeral Home* (1996) 42 Cal.App.4th 1124 [50 Cal.Rptr.2d 169]. *Shea* is the most relevant precedent for our purposes, but it does not assist appellants.

In *Shea,* a physician admitted he had attempted to hypnotize four patients on separate occasions and, thereafter, described to them in lurid and salacious detail various acts of sexual foreplay and intercourse. (81 Cal.App.3d at pp. 569-570.) An expert testified that Dr. Shea's failure to obtain an adequate history before subjecting the patients to hypnosis, and administering sex-related treatments the patients neither requested nor wanted, was " 'unprofessional.' " (*Id.* at p. 573.) The Board of Medical Examiners agreed and revoked the physician's license based on its conclusion that Dr. Shea had engaged in "unprofessional conduct" within the meaning of the predecessor to section 2234. (81 Cal.App.3d at p. 570, citing former § 2361, repealed by Stats. 1980, ch. 1313, § 1.6, p. 4445.) Based on an independent review of the record, the trial court upheld the decision of the board and denied the physician's petition for writ of mandate. (81 Cal.App.3d at p. 570.)

On appeal, a panel of the Third Appellate District rejected the physician's argument that the term "unprofessional conduct" was vague and indefinite. (*Shea, supra,* 81 Cal.App.3d at pp. 574-575.) The *Shea* court reasoned as follows: "The purpose of the State Medical Practice Act (§ 2000 et seq.) is to assure the high quality of medical practice; in other words, to keep unqualified and undesirable persons and those guilty of unprofessional conduct out of the medical profession. [Citations.] [¶] Section 2361 provides that '[unprofessional] conduct includes, but is not limited to' certain enumerated conduct. . . . This does not mean, however, that an overly broad connotation is to be given the term 'unprofessional conduct;' *it must relate to conduct which indicates an unfitness to practice medicine.* [Citations.] Unprofessional conduct is that conduct which breaches the rules or ethical code of a profession, or conduct which is unbecoming a member in good standing of a profession. [Citation.]" (81 Cal.App.3d at pp. 574-575, fn. omitted, italics added.) Under this interpretation, the *Shea* court found the appellant physician had demonstrated "unfitness to practice medicine," with his conduct most nearly approaching that proscribed by former section 2361.5, i.e.,

" '[c]learly excessive . . . treatment . . . as determined by the customary practice and standards of the local community of licensees . . . .' " (81 Cal.App.3d at p. 575, fn. 6; and see § 725 [current provision defining "clearly excessive prescribing or administering of drugs or treatment" as "unprofessional conduct"].)

Unlike the actions of the physician in *Shea,* the conduct appellants seek to enjoin does not fall into any category of "unprofessional conduct" expressly set forth by statute. It is not alleged to be a violation of any particular statutory provision found in chapter 5 of division 2 of the Business and Professions Code (§§ 2000-2529.5). (§ 2234, subd. (a).) It is not alleged to constitute any type of professional negligence. (*Id.,* subds. (b), (c).) Appellants make no allegation or argument that physician participation in executions involves "dishonesty or corruption" (*id.,* subd. (e)), or would provide a basis for denying a certificate in the first place (*id.,* subd. (f)).[5] The conduct of the physician in *Shea* also raised questions about his professional competence, insofar as he undertook nonemergency treatment without first obtaining an adequate history from the patients. No issues of lack of professional skill or incompetence (*id.,* subd. (d)) are involved in this case.

Thus, as we have noted, appellants must rely solely on a theory that physician participation in executions is unethical, i.e., "breaches the rules or ethical code of a profession" (*Shea, supra,* 81 Cal.App.3d at p. 575), and, on that basis alone, should be found to constitute "unprofessional conduct" within the meaning of section 2234.[6] While the quoted passage from *Shea* provides some support for appellants' argument in this regard, that language is at best dicta or at least an overstatement of the applicable law.

---

[5]Subdivision (g) of section 2234 was added in 1996. (See Stats. 1996, ch. 902, § 3.) It has no bearing on the instant case.

[6]Appellants have presented for judicial notice writings reflecting the views of the American Medical Association, the California Medical Association, the World Medical Association, the American College of Physicians, and the American Public Health Association, as well as medical ethicists, all agreeing that physician participation in lethal injection executions violates the ethical principles to which the profession adheres. Many of these writings are based on the Hippocratic Oath which begins with the words, "Primum non nocere," i.e., "First, do no harm." (*The Oath of Hippocrates,* as quoted in AMA Council Rep., *supra,* 270 JAMA 365.) The oath continues in pertinent part: "Neither will I administer a poison to anyone when asked to do so nor will I suggest such a course." (*Ibid.*) The Hippocratic Oath reaches back over 2,000 years and represents a fundamental principle for the medical profession. (New Webster's Dictionary (1992) p. 184; Ragon, *A Doctor's Dilemma: Resolving the Conflict Between Physician Participation in Executions and the AMA's Code of Medical Ethics* (1995) 20 U. Dayton L.Rev. 975, 989 (hereinafter, *A Doctor's Dilemma*).) Consistent with the Hippocratic Oath, the American Medical Association, the California Medical Association and the American College of Physicians declare that physician participation in state-ordered executions violates medical ethics. The World Medical Association, the American Public Health Association, the National Commission on Correctional Health Care, the Physicians for Human Rights, the Society for Correctional Physicians, and the National

As respondents note, the quote from *Shea* cannot be read out of context but, rather, must be understood both in the factual context presented in that case, and in light of the sentence preceding it which states that " 'unprofessional conduct' . . . must relate to conduct which indicates an unfitness to practice medicine." (81 Cal.App.3d at p. 575.) The concept of "unfitness to practice medicine" must be understood by reference to the qualifications established by the State of California for licensure as a physician and surgeon, and the types of conduct which the Legislature and the courts have defined as grounds for discipline or loss of the professional license. (See, e.g., §§ 2234 [general definition of "unprofessional conduct"], 2236 [conviction of crime substantially related to the qualifications, functions or duties of a physician as unprofessional conduct], 2238 [conviction of federal or state laws regulating dangerous drugs and controlled substances as unprofessional conduct], 2239 [misuse or abuse of dangerous drugs, controlled substances or alcoholic beverages as unprofessional conduct], 2280 [practice of medicine while under the influence of narcotic drug or alcohol as unprofessional conduct], 2241 [furnishing drugs or controlled substances to an addict as unprofessional conduct], 2253 [procuring, aiding, or abetting an illegal abortion, except as authorized by the Therapeutic Abortion Act (Health & Saf. Code, § 123400 et seq.) as unprofessional conduct], 2271 [false or misleading advertising as unprofessional conduct]; *Glover* v. *Board of Medical Quality Assurance* (1991) 231 Cal.App.3d 203, 205-206 [282 Cal.Rptr. 137] [physician's license revoked for repeatedly dispensing potentially lethal doses of prescribed medications for a patient who had attempted and ultimately succeeded at suicide using these medications]; *Windham* v. *Board of Medical Quality Assurance* (1980) 104 Cal.App.3d 461, 470 [163 Cal.Rptr.

---

Commission on Correctional Health Care have also deemed it unethical for physicians to participate in executions. (*A Doctor's Dilemma, supra,* 20 U. Dayton L.Rev. at p. 991.)

Medical ethicists have also published articles in medical and science journals, asserting that physician participation in executions is unethical. One author describes the ethical principle against physician participation in executions as "settled and widely accepted." (Troug & Brennan, *Participation of Physicians in Capital Punishment* (1993) 329 New Eng. J. Med. 1346.) Medical ethics scholars express the view that, because none of the preparatory or facilitating actions performed by physicians in execution processes has any therapeutic or beneficial purpose, they are all unethical. (See, e.g., American College of Physicians, Breach of Trust: Physician Participation in Capital Punishment: Statement of Professional Societies Regarding Disciplinary Action (1994) p. 42 (hereinafter, Breach of Trust); see also *A Doctor's Dilemma, supra,* 20 U. Dayton L.Rev. at p. 1001.) They opine that when physicians perform medical acts to facilitate an execution, or when physicians prepare for execution by arranging supplies and equipment, they are acting outside of their roles as healers by assisting the state in taking a human life. (Breach of Trust, *supra,* at p. 42.) Even pronouncing death is regarded as constituting an unethical act because, if the lethal injection does not initially cause the inmate's death, the physician may have to use his or her medical skills to direct actions that would more certainly result in death. (AMA Council Rep., *supra,* 270 JAMA at p. 367; see also Thorburn, *Physicians and the Death Penalty* (1987) 146 W. J. Med. 638.)

566] [physician convicted of evading $65,000 in taxes subject to discipline]; *Shea, supra,* 81 Cal.App.3d at pp. 578-579 [physician's license revoked because of improper sexual conduct with four patients, coupled with unwanted treatment without an adequate medical history]; *Matanky v. Board of Medical Examiners* (1978) 79 Cal.App.3d 293, 304-305 [144 Cal.Rptr. 826] [physician's license revoked because he intentionally submitted several false and fraudulent Medicare claims for purpose of personal gain].) We must also keep in mind that the statutory definition of "unprofessional conduct" must not be given an "overly broad connotation" if it is to pass constitutional muster. (See, e.g., *Cartwright v. Board of Chiropractic Examiners* (1976) 16 Cal.3d 762, 767 [129 Cal.Rptr. 462, 548 P.2d 1134]; *Shea, supra,* at p. 575.) We conclude that there is nothing about physician participation in executions which automatically constitutes "unprofessional conduct" or renders a participating physician "unfit" to practice medicine in California.

Of greater significance, however, is the fact that the Legislature clearly has *authorized* physician participation in executions.[7] Specifically, Penal Code section 3700.5 requires the Director of Corrections, once an execution date has been established, to "select and appoint three alienists . . . from the medical staffs of the Department of Corrections . . . to examine the defendant, under the judgment of death, and investigate his or her sanity." Section 3700.5 further requires the alienists "to examine such defendant and investigate his or her sanity, and to report their opinions and conclusions thereon, in writing." Penal Code section 3605 requires the warden of San Quentin to "invite the presence of two physicians" at the execution. Moreover, it is reasonable to assume that by enacting Penal Code section 3604, subdivision (a), authorizing execution by "intravenous injection of a substance or substances in a lethal quantity sufficient to cause death," the Legislature contemplated direct participation by physicians in the execution process. Surely, the Legislature could not have expressly and implicitly provided for physician involvement in executions, and simultaneously subjected participating physicians to discipline or other legal sanctions for engaging in lawful conduct.

Appellants further contend that a violation of ethical rules, even standing alone, must be actionable pursuant to sections 2234 and 2311 because such rules are set forth by major medical associations and leading medical ethicists to guarantee both the trust that must exist between physicians and

---

[7]It is less clear whether, as respondents contend, Penal Code sections 3604 and 3700.5 implicitly *require* physician participation in the process of executing an inmate by lethal injection. We express no opinion on this issue.

their patients and the healing nature of medicine.[8] We agree, as a general matter, that the ethical rules serve such a vital purpose. We do not agree, however, that physician participation in executions is likely to erode trust between individual physicians and patients who have not been sentenced to death for a capital crime, or undermine public confidence in physicians or the medical profession as a whole. Indeed, appellants acknowledge that physicians have long participated in and witnessed gas chamber executions in California, yet they make no showing or assertion that such conduct has in any way affected the trusting quality of the physician-patient relationship for the population at large.

In sum, then, we conclude that the Legislature did not intend to include physician participation in executions within the ambit of "unprofessional conduct" as that term is used in section 2234.[9] Thus, an essential element of appellants' sole cause of action fails, and respondents' demurrer was properly sustained without leave to amend.

### III. CONCLUSION

For all the foregoing reasons, the judgment of the trial court is affirmed.

Corrigan, J., and Parrilli, J., concurred.

---

[8]For example, amicus curiae Professor George J. Annas, who has published extensively on issues concerning medical ethics, observes that "[m]edical ethics contemplates that the nature of both illness and healing mean that the physician-patient relationship must be based on a covenant of trust . . . . A patient can only voluntarily submit to the power of a physician if he or she trusts that the physician will use his or her power only in the patient's best interests. [¶] Physician participation in executions completely undermines this trust . . . , for it brings before the public the spector of a physician taking the life of a healthy human being against that individual's wishes. As such, it creates in the public consciousness the idea that physicians can and do act as agents of the state, without consent, and against their patient's interests."

[9]Given our conclusion on this issue, we need not decide whether lethal injection without physician participation would violate the Eighth Amendment prohibition against cruel and unusual punishment. Our conclusion also obviates the need to decide whether appellants were required to exhaust their administrative remedies before the Division of Medical Quality (§ 2220), and whether the injunctive relief appellants seek would be barred by Civil Code section 3423, subdivision (d), and Code of Civil Procedure section 526, subdivision (b)(4).